UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

FRANK DICHIARA,

                       Plaintiff,               **REPORT AND RECOMMENDATION**
                                                    **06 CV 6123 (KAM)(LB)**

           -against-

DR. LESTER N. WRIGHT; DR. ALEX LANG;
DR. JOHN PERILLI; DR. MIKULAS HALKO;
DR. KIMBERLY CAPUANO; NURSE
HANSEN; DR. EDWARD SOTTILE; DR. JOHN
SUPPLE; DR. JENNIFER MITCHELL; and
DR. FELIZ EZEKWE,
                            Defendants.

-----------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

      Plaintiff, Frank DiChiara, brings this action pursuant to 42 U.S.C. §1983, alleging that

defendants, medical personnel and staff employed by the New York State Department of

Corrections ("DOCS"), were deliberately indifferent to his medical needs while he was

incarcerated in violation of his Eighth Amendment rights. Defendants move for summary

judgment pursuant to Fed R. Civ. P. 56. The Honorable Kiyo A. Matsumoto, United States

District Judge, referred defendants' motion to me for a Report and Recommendation in

accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully

recommended that defendants' motion for summary judgment should be granted.

## BACKGROUND

      Plaintiff alleges that defendants were deliberately indifferent to his medical needs while

he was incarcerated by (1) delaying his treatment for hepatitis C, and (2) refusing to re-treat

plaintiff after 48 weeks of treatment with pegylated interferon and ribavirin proved ineffective. (Compl. ¶¶ 47, 51, 66, 83-90; 108).

Plaintiff first discovered that he had contracted the hepatitis C virus ("HCV") in 1997 while he was incarcerated at Sing Sing Correctional Facility. (Deposition of Frank DiChiara ("DiChiara Dep." at 6.) A physician's assistant at Sing Sing explained to him at that time that the virus was in the early stages of infection, and that treatment would not yet be appropriate. (DiChiara Dep. at 16.) However, on May 16, 2002, a blood test revealed that the virus had progressed significantly, and that he held a high volume of the viral particles in his blood.[1] A liver biopsy conducted on February 2, 2003 showed plaintiff's liver was scarred and confirmed that the virus had advanced to chronic hepatitis C grade 2, stage 2-3. (Compl. ¶¶ 33-34; Defendants' Statement of Undisputed Facts Pursuant to Rule 56.1 ("Defs.' 56.1 Statement") ¶38.)

In 1997, DOCS developed guidelines, known as the "Hepatitis C Primary Care Practice Guideline" ("PCPG"), for treating inmates diagnosed with HCV. (Declaration of Lester N. Wright, M.D. ("Wright Decl.") ¶¶7,10; NY DOCS Division of Health Services Hepatitis C Primary Care Practice Guideline, attached to Def.'s Motion as Exhibit E.) The PCPG is periodically updated and, like all of DOCS' Clinical Practice Guidelines, is based on "nationally recognized recommendations" and "task groups made up of both DOCS providers and outside experts . . . ." (Wright Decl. ¶¶ 5-7.) Once a treating physician determines that an inmate with HCV has met a series of factors under the guidelines, the physician may recommend a course of treatment to Dr. Lester Wright, Deputy Commissioner and Chief Medical Officer for DOCS. (Id.

---

[1] The test showed a viral load of more than 1 million copies/mL, as measured by the polymerase chain reaction method. (Declaration of Edward Lebovics, M.D. ("Lebovics Decl.") ¶ 10; Lab Report, attached as Ex. B to the Declaration of Felix Ezekwe, M.D. "Ezekwe Decl.").

¶ 8.)  However, the final determination whether to administer treatment for HCV remains with Dr. Wright. (Id.)

Once a patient has been approved for treatment, DOCS implements a specific form of HCV treatment recommended by the Food and Drug Administration ("FDA") and the National Institutes of Health ("NIH").  The particular treatment regimen varies somewhat from patient to patient, but is based largely on the type of HCV infecting the patient – in plaintiff's case, genotype one.  HCV genotype one calls for a 48-week course of treatment consisting of weekly injections of pegylated interferon and a dose of ribavirin pills. (Id. ¶12.)   The goal of the treatment is to achieve a "sustained virologic response" ("SVR") by the close of the 48-week program, where the presence of the virus is undetectable through a HCV blood test known as polymerase chain reaction.   (Wright Decl. ¶13; Declaration of Edward Lebovics, M.D.[2] ("Lebovics Decl.") ¶6, attached to Defendants Notice of Motion for Summary Judgment.)

The genotype of the virus, as well as the patient's HCV viral load are considered to be the best predictors of success in such treatment. (Lebovics Decl. ¶7; Deposition of Franklin Klion, M.D.[3] ("Klion Dep.") at 69, attached to Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("P's Opp.")) The higher the viral load, the less likely a patient will achieve SVR at the end of 48 weeks. (Lebovics Decl. ¶7.)   However, a patient's viral load is not necessarily an indication of how far the virus has progressed. (Id.)

Before plaintiff could begin his treatment, the PCPG required that he participate in Alcohol Substance Abuse Therapy ("ASAT"), a compulsory substance abuse program for all

---

[2] Dr. Lebovics is defendants' expert.
[3] Plaintiff submits Dr. Klion as his expert.

inmates with hepatitis C and a history of substance abuse.[4] (Compl. ¶52; Def's 56.1 Statement ¶33.)  Plaintiff initially refused to partake in ASAT, stating "I am not going to participate in a drug program because I have not used any drugs in my life except medication from doctors." (Handwritten Note from Plaintiff to DOCS Staff, attached to Affidavit of Frank DiChiara in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Aff.") as Exhibit 5.)  Plaintiff finally relented in January 2004 and agreed to enroll in the ASAT program. (See Exhibit 4 attached to Pl.'s Aff.; DiChiara Dep. at 24; Defs.' 56.1 Statement ¶ 42).

The PCPG also included a provision which required the treating physician to certify that the duration of the recommended treatment program would not exceed the inmate's remaining time in incarceration.[5] (Wright Decl. ¶10.)  Defendants' rationale for this provision was to prevent the interruption of an inmate's course of treatment by his release.[6]  Accordingly, on April 25, 2003, Dr. P.K. Kwan recommended delaying plaintiff's treatment until after his parole date on February, 11 2004. (Pl.'s Dep. at 24, 27; Defs.' 56.1 Statement ¶43; see also Exhibits 7-9 attached to Pl.'s Aff.)  When plaintiff was denied parole, he began his 48-week course of treatment of Interferon and Ribavirin on April 5, 2004.  (Compl. ¶62; Defs.' 56.1 Statement ¶44).

Plaintiff's 48-week treatment concluded on March 30, 2005 without the desired sustained virologic response. (Compl. ¶40; Wright Decl. ¶14; Defs.' 56.1 Statement ¶¶49-53.)  Defendants continued to monitor plaintiff after the termination of therapy. (Declaration of Dr. John Supple ("Supple Decl.") ¶¶ 18-19, attached to Def's Motion; Defs.' 56.1 Statement ¶¶23, 27-28).  The

---

[4] According to defendants, ". . . the possibility of reinfecting [the liver] . . . is so high that it doesn't make a whole lot of sense to treat the hepatitis C without dealing with the underlying problem through which infection comes in most of our inmates." (Deposition of Lester Wright ("Wright Dep.") at 35).

[5] For patients such as plaintiff with HCV genotype one to begin treatment, the inmate could not be eligible for parole in less than 15 months. (PCPG at 4.)

[6] It is the policy of NYSDOCS to avoid interruptions in hepatitis C treatment because partial treatment is "apt to be ineffective and may even be dangerous by selecting out the difficult viruses and leaving those, killing the easy ones and leaving the hard ones behind . . ." (Wright Dep. at 43-44; see also Lebovics Decl. ¶7 (". . . [reduction below] eighty percent of the recommended [treatment] duration, is associated with a significantly decreased chance of [sustained virologic response].")

monitoring included a biopsy of plaintiff's liver on February 23, 2006, which determined that plaintiff had chronic hepatitis C, grade 1, stage 2. (Wright Decl. ¶24.)

Beginning in January of 2006, plaintiff wrote letters urging defendants to restart his treatment, citing higher ALT[7] levels and an increased viral load.[8] Plaintiff informed defendants that his condition was causing him "unbearable symptoms" such as "nerves, restless[ness], confusion, loss of coordination, worries, especially of dying in prison, depression, inso[m]nia, delirium, frustration for not being treated accordingly, and other painful feelings." (DiChiara Aff. ¶10.) Plaintiff even offered to pay the cost of his continued treatment. On January 31, 2006, plaintiff filed an institutional grievance demanding retreatment. (Compl. ¶79.)

On March or April 3, 2006, plaintiff was sent to Staten Island University Hospital for a colonoscopy unrelated to plaintiff's HCV. (Compl. ¶¶83,87; Defs.' 56.1 Statement ¶53; Letter dated Sept. 12, 2006 from Dr. Wright, attached to Pl.'s Aff. as Exhibit 31) During that visit, plaintiff discussed the status of his HCV with the gastroenterologist, who recommended that plaintiff go back on treatment. On April 21, 2006, Dr. Ezekwe forwarded the gastroenterologists' consultation report to Dr. Wright, and requested that plaintiff be considered for re-treatment. (Compl. 84; Defs.' 56.1 Statement ¶54). Dr. Wright denied the request, reasoning that re-treatment was medically unnecessary, and that the gastroenterologist did not have the benefit of reviewing plaintiff's medical chart and history. (Defs.' 56.1 Statement ¶55; Ezekwe Decl. ¶22). On September 15, 2006, Dr. Ezekwe sent a second request for retreatment to Dr. Wright, indicating that plaintiff's ALT level was 63, which was higher than plaintiff's baseline.[9] (Compl.

---

[7] "ALT" refers to serum aminotransferase, which is considered an accurate measure of one's liver function. (Wright Decl. ¶22.)
[8] Plaintiff claims that his viral load had climbed to 5,882,278 copies/mL.
[9] Plaintiff's expert contradicts plaintiff's claim that his "ALT" level should necessarily have required re-treatment. (Klion Dep. at 68 (". . . [ALT levels] really are not significant. They only mean that there is inflammation in the liver. Some of the testimony there [of plaintiff] I didn't pay attention to, I didn't think it was relevant."))

¶84; Defs.' 56.1 Statement ¶56.)   Dr. Wright again denied plaintiff's request for re-treatment. (Compl. ¶84; Letter from Dr. Wright to Dr. Ezekwe, attached to Pl.'s Aff. as Exhibit 32; Defs.' 56.1 Statement ¶57.)

Plaintiff was released from prison on September 20, 2007, and began re-treatment shortly thereafter.  (DiChiara Dep. at 60; Klion Decl. ¶11.) After 48 weeks, the re-treatment successfully cleared plaintiff's blood of the hepatitis C virus. (Klion Decl. ¶11.)

## PROCEDURAL HISTORY

After filing his *pro se* complaint commencing this action, plaintiff moved on January 17, 2007 for a temporary restraining order and preliminary injunction seeking an order that defendants immediately send him for an examination by a medical specialist. (Document 19.) The parties briefed the matter, and on March 7, 2007 Judge Vitaliano[10] denied plaintiff's application and ordered that discovery proceed on the underlying complaint. (Document 41.)  On November 14, 2007, plaintiff's attorney, Anthony C. Ofodile, filed a notice of appearance on plaintiff's behalf. (Document 65.)

After completing discovery, defendants moved for summary judgment and the motion was scheduled to be fully briefed and filed by February 23, 2009. (See document 81.)  However, plaintiff's opposition to the motion included the expert testimony of Dr. Franklin Klion, who had not been disclosed to defendants as an expert witness.  (Document 91.)  Defendants moved to preclude Dr. Klion's testimony.   The court denied the motion, re-opened discovery for the limited purpose of allowing defendants to depose Dr. Klion, and marked defendants' motion for summary judgment as withdrawn without prejudice. (Id.)  The Court further shifted the cost of Dr. Klion's deposition to plaintiff's counsel, Mr Ofodile, as a sanction for his failure to disclose

---

[10] The case was transferred to Judge Matsumoto on September 24, 2008. (Document 76.)

his witness during the discovery period. (Id.)  Defendants now renew their motion for summary judgment, plaintiff opposes the motion, and defendants reply.

## STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997) (quoting Anderson, 477 U.S.  at 248 ); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000).  Since defendants are moving for summary judgment, we view the facts here in the light most favorable to plaintiff.

"An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but … must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Matsushita, 475 U.S. at 586-87 (1986).  In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257.  "Conclusory allegations, conjecture, and speculation …  are

insufficient to create a genuine issue of fact." Niagara Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

## DISCUSSION

### I. EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO MEDICAL NEEDS

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend VIII; Estelle v. Gamble, 429 U.S. 97, 101 (1976). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104). "[T]he Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). A deliberate indifference claim requires plaintiff to satisfy both an objective and a subjective component. Id. at 183-84.

#### a. *Objective Component*

The objective test asks whether a deprivation of adequate medical care was "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006)(citing Farmer v. Brennan, 511 U.S. 825, 832, 844 (1994)). A prisoner is only entitled to *reasonable* care, id. at 844-45, and only "deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation," Wilson v. Seiter, 501 U.S. 294, 298 (1991)(citation omitted). "[The Court does] not sit as a medical board of review. Where the

dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctor." Hathaway v. Coughlin, 37 F.3d 63, 70 (2d Cir. 1994)(internal citations omitted); Amaker v. Goord, No. 98 Civ. 3634, 2002 WL 523371, 7 (S.D.N.Y. March 29, 2002) (granting summary judgment, and stating that plaintiff's disagreement over the course of treatment is not sufficient to raise a triable issue of fact); see also Nails v. Laplante, 596 F. Supp. 2d 475, 480 (D. Conn. 2009)(A doctor's judgment regarding care is "presumed valid" unless there is evidence of "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.")(quotation omitted.)

The Court must also examine whether any inadequacy in the provision of medical care has caused, or will likely cause the plaintiff harm. Salahuddin, 467 F.3d at 280 (citing Helling v. McKinney, 509 U.S. 25, 32-33 (1993)).

### b. *Subjective Component*

The subjective component of deliberate indifference requires a plaintiff to establish that defendant "kn[e]w of and disregard[ed] an excessive risk to [his] health or safety." Chance, 143 F.3d at 702 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Defendants must act with a sufficiently culpable state of mind "equivalent to the familiar standard of 'recklessness' as used in criminal law." Phelps v. Kapnolas, 308 F.3d 180, 186 (2d Cir. 2002) (per curiam).

The Second Circuit has found deliberate indifference in cases where "officials deliberately delayed care as a form of punishment; ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." Espinal v. Coughlin, No. 98 Civ. 2579, 2002 U.S. Dist. LEXIS 20 (S.D.N.Y. Jan. 2, 2002)(internal

quotations and citations omitted). "Mere negligence in diagnosis or treatment is insufficient to state a valid Eighth Amendment claim" and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Smith, 316 F.3d at 184 (citing Estelle, 429 U.S. at 105-06).

Plaintiff alleges that defendants were deliberately indifferent to his medical needs by (1) delaying his treatment for hepatitis C, and (2) refusing to re-treat him after the 48 weeks of treatment proved ineffective. (Compl. ¶¶ 47, 51, 66, 83-90; 108). However, as set forth below, plaintiff fails to establish that defendants were deliberately indifferent to his medical needs and therefore defendants' motion for summary judgment should be granted.

## II. DEFENDANTS' DELAY IN PROVIDING TREATMENT

Plaintiff's first claim of deliberate indifference relates to defendants' delay in initiating his treatment for HCV through a regimen of pegylated interferon and ribavirin.[11] As discussed above, plaintiff was initially denied treatment for two reasons: (1) he had not enrolled in the ASAT program, and (2) the 48-week treatment period would exceed his remaining time in incarceration.

### a. Actual Harm

Plaintiff has failed to proffer evidence that the delay in his treatment for HCV caused him harm. For allegedly unreasonable delays or interruptions in treatment, the inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Smith, 316 F.3d at 185. To determine whether a delay in treatment constitutes

---

[11] Plaintiff argues that the period of delay began on May 16, 2002 when a blood test showed plaintiff had a viral load of more than 1 million copies/mL, at which point, plaintiff suggests, he should have been given a liver biopsy. (P's Memo at 15.) However, plaintiff's own expert states that once "there is evidence of progressive disease, that is, that the disease has progressed to stage 2, which the biopsy performed in February 2003 confirmed, treatment should have been initiated at that time." (Klion Decl. ¶4.)

a constitutional violation, the court considers whether the patient's medical condition worsened as a result of the delay, as well as the reasons for the delay. Id. at 186.

Plaintiff's expert testified that the delay "cannot be justified under any accepted medical practice . . . ." (Compl. ¶¶49, 51; Klion Decl. ¶7.)  He states "[o]nce diagnosis of hepatitis C is established and there is evidence of progressive disease, that is, that the disease has progressed to stage 2, which the biopsy performed in February 2003 confirmed, treatment should have been initiated at that time."  (Klion Decl. ¶4.)  "[T]he standard rule is that the earlier you treat, the more likely you are going to have an SVR. . . . if a person had stage 2 or stage 3 disease, then the harm might be that over the next year, there would be progression of the disease." (Klion Dep. at 41:9, 42:13.)

Defendants' expert disagrees, calling the delay "insignificant to the final outcome of the combination therapy." (Lebovics Decl. ¶ 18.)  He adds that HCV generally is a "very slow developing disease, typically over the course of decades, and it generally does not require immediate attention in order for the therapy to be successful."

For plaintiff to prevail, he must do more than proffer testimony as to what "might" occur with the progression of the disease. (See Klion Dep. at 42:13.)  Rather, plaintiff must show "very likely" future harm, Helling, 509 U.S. at 32-33, or that his condition *actually* worsened as a result of the delay, Smith, 316 F.3d at 186.  Plaintiff offers no evidence of this, and his own expert witness, Dr. Klion, fails to support either proposition.  At deposition, Dr. Klion was asked to discuss the potential impact of a year's delay in treatment on plaintiff's health.

> Q: Is there harm in waiting to treat?
> A: The standard rule is that the earlier you treat, the more likely you are going to have an SVR . . .  If you are asking percentage wise, if you wait a year or wait two years, how much that is going to make a difference? I can't give you an honest answer to that.

(Klion Dep. at 41.)

Dr. Klion was also asked at deposition to comment on the *actual* impact of the delay on plaintiff's condition.

> Q: Now, from that perspective [2009], what was the practical effect of this year's delay?
> A: Well, the proof is in the eating, right? And he cured.
> Q: Then it is fair to say that there was no practical impact from a year's delay?
> A: In retrospect, that's correct.

(Klion Dep. at 79-80.)

To the extent that plaintiff suffered mental anguish during this time, as plaintiff's expert suggests,[12] plaintiff is barred by the Prison Litigation Reform Act ("PLRA") from claiming damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e); Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002). Plaintiff does not proffer any evidence that his physical symptoms[13] were caused by the delay in treatment.[14] In fact, plaintiff's expert testified that there was "no practical impact" and that "aside from the mental anguish, [ ] in retrospect probably nothing imperative will happen to him physically." (Klion Dep. at 81.)

Plaintiff therefore fails to show that the delay in his care violated his constitutional rights.

---

[12] See Klion Dep. at 81 ("[F]or several years, [plaintiff] was very upset in that he had hepatitis C.")

[13] Plaintiff's claimed physical symptoms included "unbearable body itching, fatigue, loss of memory, loss of coordination, insomnia and confusion[,] red bloody pimples resembling angiomas [] all over [his] torso." (Letter from plaintiff to Dr. Wright dated March 20, 2003, attached to P's Aff as Exhibit 4.)

[14] Furthermore, plaintiff was continually monitored by medical staff for these and other medical complaints even after his 48-week treatment period ended. (Supple Decl. ¶¶ 18,19; Defs.' 56.1 Statement ¶¶ 23, 27-28.) Plaintiff has not established that defendants were deliberately indifferent to these "physical symptoms" whether or not they were related to his HCV condition.

### b. *ASAT Program*

Even if plaintiff proved that he was actually harmed by the delay in his treatment, plaintiff's Eighth Amendment claim would still fail. First, plaintiff argues that he "will be able to prove that the ASAT policy was itself arbitrary as it denied treatment to prisoners who have either completed substance-abuse programs in the past or who have never displayed any signs of drug or alcohol abuse." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("P's Memo") at 17.)

In 2005, the Second Circuit held in Johnson v. Wright, 412 F.3d 398 (2d Cir. 2005), that denial of HCV treatment solely because a prisoner has not completed the ASAT prerequisite could create a triable issue of fact in three scenarios: (1) where there is consensus among the prisoners' medical providers that treatment is necessary regardless of the prerequisite, (2) where defendants fail to determine whether the justifications for the ASAT prerequisite apply to the individual patient, and (3) where defendants "reflexively" rely on the purported soundness of the guideline itself, even where they are on notice that a departure might be medically appropriate. Id. at 404-06.

Plaintiff argues that Johnson applies here. Plaintiff wrote to the prison medical staff in May 2003 stating that he never took "any drugs in [his] life except medication from doctors." (Handwritten Note from Plaintiff to DOCS Staff, attached Pl.'s Aff. as Exhibit 5.) Defendants have not contested this assertion, nor have they produced evidence that they made any inquiry regarding plaintiff's personal history of alcohol and substance abuse, or balanced the underlying purpose of the policy with plaintiff's need for treatment.

Nevertheless, the constitutionality of defendants' application of the ASAT program as a prerequisite to treatment was not "clearly established" law at the time defendants required plaintiff to enroll in ASAT. Defendants are therefore entitled to qualified immunity.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity analysis involves two-steps: first, the Court must determine whether the facts alleged make out a violation of a constitutional right; if the plaintiff establishes a constitutional violation, the Court must then determine whether the conduct alleged violated "clearly established" statutory or constitutional rights of which a reasonable person would have known. Saucier v. Katz, 533 U.S. 194, 201 (2001). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004). The Supreme Court recently held that the sequence of the Saucier two-step analysis is not mandatory, and that "[t]he judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

The Circuit has issued two published opinions directly questioning the constitutionality of the ASAT prerequisite: McKenna v. Wright, 386 F.3d 432 (2d Cir. 2004)(rejecting defendants' qualified immunity defense regarding the ASAT prerequisite at the pleading stage) and Johnson v. Wright. These two opinions were issued on October 18, 2004 and June 24, 2005

– both *after* plaintiff's HCV treatment began. It was therefore not clearly established law at the time that defendants required plaintiff to enroll in the ASAT program that DOCS' application of the ASAT prerequisite raised Eighth Amendment concerns.[15] Even if the Court had found the delay in plaintiff's treatment due to defendants' requirement of the ASAT program violated plaintiff's constitutional rights, defendants would be entitled to qualified immunity.[16] See Verley v. Wright, No. 02 Civ. 1182, 2007 U.S. Dist. LEXIS 857 at *43 (S.D.N.Y. Sept. 27, 2007)(holding that even if the court assumes that Johnson clearly established certain rights related to the ASAT program, Johnson was not decided until after the events at issue in the case, and defendants would be entitled to qualified immunity).

### c. *Remaining Time in Incarceration*

As detailed above, defendants also delayed plaintiff's treatment based on the PCPG provision regarding the prisoner's remaining time in incarceration. However, as with the ASAT prerequisite, plaintiff fails to demonstrate that defendants were deliberately indifferent to his medical needs by enforcing this provision.

According to the PCPG, defendants would not approve treatment for inmates who would be eligible for parole during what would be a prisoner's 48-week course of treatment. (Wright Decl. ¶10; PCPG at 4.) Defendant Wright states that treatment for "a month or two months or three months [merely results in]… killing the easy [viruses] and leaving the hard ones behind." (Wright Dep. at 43.) By the time plaintiff was designated eligible for treatment, he was

---

[15] Plaintiff cites to a similar Second Circuit case, Conti v. Goord, 59 Fed. Appx. 434 (2d Cir. 2003)(Summary Order), which was decided on March 14, 2003 – before plaintiff's treatment began. However, Second Circuit rulings by summary order do not have precedential effect. Second Circuit Local Rule 32.1.1(a).
[16] Dr. Wright rescinded the ASAT requirement from the PCPG on October 13, 2005. Hilton v. Wright, 235 F.R.D. 40, 46 (N.D.N.Y 2006).

scheduled to appear before the parole board before he would have completed the 48-week course of treatment.

On April 25, 2003, Dr. Wright emailed Dr. P.K. Kwan, stating that "the Correctional Counselor thinks [plaintiff] is likely to have less time remaining than treatment would take. Do not submit." (Ambulatory Health Record entry dated 4/28/03, attached to Pl.'s Aff. as Exhibit 6.) Dr. Kwan therefore recommended delaying plaintiff's treatment program until after his parole board date on February, 11 2004. (Pl.'s Dep. at 24, 27; Defs.' 56.1 Statement ¶43; see also Exhibits 7-9 attached to Pl.'s Aff.) Dr. Halko also made an entry to plaintiff's record on December 3, 2003 that plaintiff was approved for interferon after he appears before the parole board. (Ambulatory Health Record entry dated 12/03/03, attached to Pl.'s Aff. as Exhibit 8.)

Defendants state that their decision to postpone plaintiff's hepatitis C treatment until after his parole hearing was based on established medical guidelines regarding the effect of interruptions on a course of HCV treatment. Nevertheless, plaintiff's expert testified that the delay "cannot be justified under any accepted medical practice . . . ." (Compl. ¶49, 51; Klion Decl. ¶7.) Defendants' expert, on the other hand, stated that there are grave effects of interrupting a course of treatment: where the patient falls below 80% of the recommended duration of treatment, there is a *significantly* decreased chance of a sustained virologic response. (Lebovics Decl. ¶7.)

Defendants further state that hepatitis C is not a fast degenerating condition, but rather "a disease of decades" that is "never an emergency." (See Wright Decl. at 44.) Plaintiff's expert agrees. (Klion Dep. at 19-20; 23-24). Defendants postponed plaintiff's treatment until after he had been denied parole, arguing that any interruption in the treatment could potentially do plaintiff more harm than good. Plaintiff fails to establish that defendants' delay in his treatment

subjected him to a significant risk of serious harm, or that their decision to delay treatment on this ground was deliberately indifferent to his serious medical need.

Although the Circuit held in <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006) that it could not "as a matter of law, find it reasonable for a prison official to postpone . . . a course of treatment for an inmate's Hepatitis C because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole," <u>id.</u> at 281, the Court need not decide whether the Correctional Counselor's statement to Dr. Wright herein constituted a sufficient "individualized assessment," (<u>see</u> Ambulatory Health Record entry dated 4/28/03, attached to Pl.'s Aff. as Exhibit 6). As with the ASAT program prerequisite, the Circuit's holding in <u>Salahuddin</u> on October 27, 2006 regarding the defendants' time-to-parole requirement was not made until *after* plaintiff had started treatment on April 5, 2004.[17] Defendants would therefore be entitled to qualified immunity as the law was not clearly established at the time plaintiff alleges his rights were violated.

Therefore, plaintiff's Eighth Amendment claim based on defendants' delay in providing him treatment cannot withstand defendants' motion for summary judgment, and defendants' motion for summary judgment on this claim should be granted.

## III. DEFENDANTS' REFUSAL TO RE-TREAT PLAINTIFF AFTER 48 WEEKS

On March 30, 2005, after 48 weeks, plaintiff's treatment was terminated without achieving the desired result. (Declaration of John Supple, M.D. ("Supple Decl.") ¶17; Compl. ¶67.) At that time, Dr. Rush, an Infectious Disease Specialist, determined that plaintiff had not responded to the treatment program. (Supple Decl. ¶16; Defs.' 56.1 Statement ¶¶47-48.)

---

[17] In 2005, DOCS developed a program to allow prisoners to continue their HCV treatment with outside partners after they are released. (Wright Dep. at 32.) Therefore, like ASAT, the time-to-parole requirement was revised in later editions of the PCPG.

Plaintiff claims the decision to terminate treatment at 48 weeks was "arbitrary, capricious, cruel and unjustifiable."(Compl. ¶41.) Plaintiff's own expert, however, disagrees: "the approved treatment period [for hepatitis C] was 48 weeks." (Klion Dep. at 28.) Further, as stated above, the 48-week duration of the program was prescribed by the PCPG for patients like plaintiff who were infected with HCV genotype one. (See PCPG at 4.)

An HCV test conducted on March 16, 2005, just prior to the close of the 48-week treatment period, revealed that plaintiff had a viral load of 590,345 copies/mL, an indication that he had not achieved the desired sustained virologic response. (Wright Decl. ¶14.) Although the parties agree that the 48-week treatment did not eliminate the hepatitis C virus from plaintiff's body, they disagree about how to characterize his response to therapy. Defendants' expert maintains that because plaintiff retained a significant viral load even after 48 weeks of treatment, he is a "non-responder." (Lebovics Decl. ¶17; Wright Decl. ¶15.) Plaintiff's expert on the other hand, maintains that although treatment did not provide a sustained viral response within 48 weeks, plaintiff's viral load did reduce during treatment.[18] Plaintiff's expert therefore considers plaintiff a "partial responder." (Klion Decl. ¶8.)

According to Dr. Wright, the National Institutes of Health's published guidelines state that "[f]ew options exist for patients who either do not respond to therapy or who respond and later relapse," and adds that "the FDA has not approved [continued treatment] for patients such as plaintiff, who have failed to respond to prior treatment." (Id. ¶¶15,16; see also PCPG at 8.) As defendants' expert testifies, "[r]e-treatment with the same regimen or with the alternative [Pegintron regimen] is not indicated and would be futile. As such, it would expose the patient to

---

[18] Plaintiff's viral load during treatment was as follows:
    June 23, 2004:          764,670 copies/mL
    October 30, 2004:       611,068 copies/mL
    March 16, 2004:         590,345 copies/mL
(Lab Reports, attached to Ezekwe Decl. as Exhibit C.)

the risks of therapy without any realistic chance of benefit." (Lebovics Decl. ¶19.) Further, "[m]aintenance therapy is investigational and not a consideration in a patient with only stage 2 fibrosis (scarring) on liver biopsy." (Id. ¶20.)

On February 26, 2006, a second liver biopsy showed that plaintiff had chronic hepatitis C, grade 1, stage 2. Plaintiff's physician at the facility, Dr. Ezekwe, made two subsequent requests to Dr. Wright to allow plaintiff to re-enter treatment.[19] (Compl.¶¶84, 90; Def.'s 56.1 Statement ¶¶54, 56.) Again, Dr. Wright followed the FDA and NIH guidelines in denying plaintiff re-treatment. (Wright Decl. ¶25.)[20] As plaintiff had not responded to the initial 48-week treatment program, defendants maintain that subsequent treatment would not be medically necessary, FDA guidelines specifically recommended against retreatment, and to permit such retreatment, in Dr. Wright's view, "would be considered [] experimenting on inmates." (Id. 25-26.) Further, the requests had not identified "specific factors" under the PCPG to warrant retreatment.[21]

---

[19] Dr. Ezekwe, however, asserts that, at the time the requests were made, plaintiff was not in "acute danger" and that "resumption of Ribavirin and Interferon was not medically necessary." (Ezekwe Decl. ¶ 17, 18.) Further, Dr. Ezekwe suggests that in forwarding the request for retreatment to Dr. Wright, he had been merely following DOCS protocol of forwarding referral requests (which, in this case, originated with the consulting gastroenterologist who did not have plaintiff's "full clinical information" on plaintiff's hepatitis C.) (Pl. Aff. Exhibit 31; Ezekwe Decl. at 21).

[20] Dr. Wright's letter to plaintiff reads:

> You completed 48 weeks of treatment . . . .You did not have complete suppression of the virus per viral load testing. Your ALT's returned to near normal and treatment was ended with consultation of an infectious disease specialist. The referral to the GI specialist at Staten Island University Hospital was regarding the possible need for a repeat colonoscopy. Unfortunately the specialist responded to your concerns about your chronic HCV without full clinical information. You have been treated for hepatitis C per our DOCS protocol and will continue to be monitored.

(Letter dated Sept. 12, 2006 from Dr. Wright, attached to Pl.'s Aff. as Exhibit 31).

[21] (See Message from Dr. Wright to Dr. Ezekwe, attached to Pl.'s Aff. as Exhibit 32)(". . . we have a clear primary guideline that says we follow national recommendations . . . if there is some specific factor in an individual case that may justify going outside of the guideline then that must be specifically stated.")

Plaintiff's expert disagrees with defendants' decision not to continue plaintiff's treatment after 48 weeks. According to him, "[m]ost hepatologists in the U.S.[22] retreated in 2006 since studies showed up to 15% success rates (total clearing of the virus) during retreatment from non-responders and partial responders." (Klion Decl. ¶9.) He adds that "most hepatologists were not following the NIH guidelines but retreated based on the examination of each patient's circumstances . . . ." (Id. at 10.)[23] According to Dr. Klion, NIH guidelines are generally used by the "broader-based medical community," whereas specialists in a certain field may be more likely to deviate from these guidelines. (Klion Dep. 57.)

Dr. Wright does not specialize in liver disease, but nonetheless followed national guidelines regarding whether to retreat plaintiff. According to defendants' expert, "[f]or patients who are non-responders to the combination therapy [administered to plaintiff], there are currently no other FDA approved or NIH recommended therapies. Retreatment with the same, or the alternative [regimen] is ineffective. . . . DOCS acted appropriately in refusing repeat antiviral therapy in this case. In doing so they correctly interpreted NIH and FDA recommendations." (Lebovics Decl. ¶8.)

At most, plaintiff has established a difference of opinion between medical providers as to whether re-treatment after 48 weeks would have been appropriate. However, in order to prevail on an Eighth Amendment deliberate indifference claim, plaintiff must show more than a mere disagreement between physicians as to the proper course of treatment. Defendants followed both FDA and NIH guidelines in determining whether plaintiff should have been retreated, and continued to monitor plaintiff after his treatment ended. (Supple Decl. ¶¶ 18,19; Defs.' 56.1

---

[22] Dr. Klion later clarified "most hepatologists in the US" to mean most hepatologists in the New York medical community, based on his own observations, not a survey or study. (Klion Dep. at 47.)

[23] Dr. Klion's deposition testimony suggests that one of the conclusions relied upon in those 2006 studies, that continued Interferon treatment would prevent some scarring in the liver, was later found to be inaccurate. (Klion Dep. at 53-54.)

Statement ¶¶ 23, 27-28).    Since plaintiff provides no evidence that defendants' conduct was unreasonable, or that their decision substantially deviated from sound medical judgment, plaintiff fails to demonstrate that defendants violated his constitutional rights.

Finally, plaintiff also fails to satisfy the subjective component of an Eighth Amendment claim.  Defendants demonstrate that they relied on the specific recommendation of an infectious disease specialist in deciding to terminate plaintiff's treatment after 48 weeks, and on FDA and NIH guidelines in deciding not to retreat him. (Supple Decl. ¶16; Lebovics Decl. ¶19-22; Wright Decl. ¶¶15-17; PCPG at 8.) Although plaintiff was retreated successfully after his release from custody, this does not establish that defendants were deliberately indifferent to his medical needs.  The Court is happy for plaintiff that he is cured.  However, as plaintiff has not shown that defendants acted with deliberate indifference to his serious medical needs in terminating his treatment and denying him re-treatment, defendants' motion for summary judgment should be granted.

## CONCLUSION

Accordingly, defendants' motion for summary judgment should be granted and plaintiff's complaint should be dismissed.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital District Physician's Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).


                                               /S/
                                    LOIS BLOOM
                                    United States Magistrate Judge

Dated: January 6, 2011
       Brooklyn, New York