UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
FRANK DICHIARA,

               *Plaintiff*,

   -against-

DR. LESTER N. WRIGHT, DR. ALEXIS
LANG, DR. JOHN PERILLI, DR. MIKULAS
HALKO, NURSE KIMBERLY CAPUANDO,
NURSE HANSEN, DR. EDWARD SOTTILE,
DR. JOHN SUPPLE, DR. JENNIFER
MITCHELL, and DR. FELIZ EZEKWE,

               *Defendants*.
----------------------------------X

**ORDER ADOPTING IN PART
AND MODIFYING IN PART
REPORT AND
RECOMMENDATION**

06-cv-6123(KAM)(LB)

**MATSUMOTO, United States District Judge:**

        Plaintiff Frank DiChiara ("plaintiff"), who from 1979

to 2007 was incarcerated under the custody of the New York State

Department of Corrections ("DOCS"), commenced this action

against Dr. Lester N. Wright, Dr. Alexis Lang, Dr. John Perilli,

Dr. Mikulas Halko, Nurse Kimberly Capuano, Nurse Hansen, Dr.

Edward Sottile, Dr. John Supple, Dr. Jennifer Mitchell, and Dr.

Feliz Ezekwe (collectively, "defendants"), medical personnel and

staff employed by the DOCS, alleging that defendants were

deliberately indifferent to his medical needs while he was

incarcerated, in violation of the Eighth Amendment to the United

States Constitution. (*See* ECF No. 1, Compl.)[1] Specifically,

---

[1]    Plaintiff dismissed his claims against eight other defendants
originally named in his complaint. (*See* ECF Order dated 3/22/2007; ECF No.
54, Stipulation of Dismissal.)

plaintiff alleges that defendants were deliberately indifferent to his medical needs by: (1) delaying his treatment for Hepatitis C for one year, (2) terminating his treatment for Hepatitis C after 48 weeks, and (3) refusing to re-treat his Hepatitis C after the initial treatment was terminated. (*See id.*)  After completing discovery, defendants notified the court of their intention to move for summary judgment. (*See* ECF No. 98, Proposed Mot. for Summ. J.)  The court referred defendants' anticipated motion to Magistrate Judge Lois Bloom for a Report and Recommendation pursuant to this court's authority under 28 U.S.C. § 636(b).  (*See* ECF Order Referring Mot. dated 12/16/2009.)

On January 6, 2011, Judge Bloom issued a Report and Recommendation ("Report & Recommendation"), recommending that the court grant defendants' motion for summary judgment in its entirety.  (*See* ECF No. 115, Report & Recommendation dated 1/6/2011 ("R&R").)  The Report & Recommendation instructed the parties that any objections to the Report & Recommendation were due within fourteen days, by January 20, 2011.  (*See id.* at 22; ECF Docket Entry accompanying R&R.)  Plaintiff requested an extension of time to file objections to the Report & Recommendation, and this court granted an extension until January 27, 2011.  (*See* ECF No. 116, First Mot. for Extension of Time to File Objections; ECF Order dated 1/22/2011.)  Plaintiff

failed to file timely objections to the Report & Recommendation, instead filing his objections on January 28, 2011. (*See* ECF No. 117, Objection to R&R dated 1/27/2011, filed on 1/28/2011 ("Pl. Obj.").) Defendants filed a timely reply to plaintiff's objections on February 17, 2011. (*See* ECF No. 118, Reply in Supp. of R&R dated 2/17/2011 ("Defs. Reply").)

For the reasons set forth below, the court adopts in part and modifies in part the Report & Recommendation, and grants defendants' motion for summary judgment in its entirety.

## STANDARD OF REVIEW

To the extent that a party makes specific and timely objections to a magistrate judge's findings or recommendations, the court must apply a *de novo* standard of review. 28 U.S.C. § 636(b)(1); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). Upon such *de novo* review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). However, where no objection to a Report & Recommendation has been filed, the district court "'need only satisfy itself that there is no clear error on the face of the record.'" *Urena v. New York*, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001) (quoting *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)).

Here, plaintiff failed to make timely objections to the Report & Recommendation, instead filing his objections one day late. (*See* ECF Order dated 1/22/2011 (granting plaintiff until 1/27/2011 to file objections to the R&R); Pl. Obj. (filed on 1/28/2011.) Plaintiff has provided no justification for his delay in filing his objections, nor has he requested that the court consider his objections despite his untimeliness, and the court may decline to do so. Nonetheless, the court will consider plaintiff's objections to Judge Bloom's Report & Recommendation, and therefore conducts a *de novo* review of the full record including the applicable law, the pleadings, the parties' submissions in connection with the instant motion for summary judgment, the Report & Recommendation, and plaintiff's objections and defendants' responses to the Report & Recommendation.

## BACKGROUND

The court presumes familiarity with the underlying facts and procedural history as set forth in more detail in the Report & Recommendation. (*See* R&R at 1-7.) Those undisputed facts, except where noted, facts are repeated here only to the extent necessary to inform the court's analysis.

Chronic hepatitis C is a liver disease caused by infection with the hepatitis C virus ("HCV"). (ECF No. 106, Defs. Rule 56.1 Statement ("Defs. 56.1 Stmt.") ¶ 25.) The

natural history of the infection is variable, with 20%
progressing to cirrhosis of the liver.  (*Id.*)  The current best
Food and Drug Administration ("FDA") approved treatment is
antiviral therapy consisting of a combination of pegylated
interferon alpha 2a or 2b (Pegasys or Pegintron) and ribavirin.
(*Id.* ¶ 26.)  Under National Institute of Health ("NIH")
Guidelines, the recommended length of treatment for patients
infected with HCV genotype 1 is 48 weeks.  (ECF No. 104-7,
Declaration of Dr. Lester Wright ("Wright Decl."), Ex. E, NIH,
Chronic Hepatitis C: Current Disease Management ("NIH
Guidelines") at 10, 12, 18; ECF No. 110, Affirmation of Anthony
Ofodile ("Ofodile Aff."), Ex. 3, Deposition of Dr. Franklin
Klion ("Klion Dep.") at 28 (admitting that "the approved
treatment period was forty-eight weeks").)  The desired result
from the therapy is a sustained virologic response ("SVR"),
meaning that the virus is not detectable in the blood at the
conclusion of therapy and six months after the conclusion of
treatment.  (Defs. 56.1 Stmt. ¶ 26.)[2]  The most important
predictors of response to therapy are the genotype, which is the

---

[2]     Defendants argue that patients who fail to completely clear the virus
after the first course of treatment are "non-responders."  (Defs. 56.1 Stmt.
¶ 26.)  The NIH Guidelines similarly label patients who fail to completely
clear the virus after the first course of treatment as "non-responders."
(*See generally* NIH Guidelines.)  Plaintiff, on the other hand, argues that
there is a third category of patients, "partial responders," for whom the
first round of treatment significantly lowers the viral load, even if the
viral load is not completely undetectable at the end of the treatment course.
(ECF No. 109, Pl. 56.1 Statement in Opp'n to Mot. for Summ. J. ("Pl. 56.1
Stmt.") ¶ 26.)

genetic subtype of the virus, and the viral load, which is a measure of viral particles in the blood. (*Id.* ¶ 27.) Patients infected with genotype 1, as was plaintiff, are less responsive to treatment than patients infected with genotypes 2 or 3. (*Id.*) Patients with a high viral load, defined as greater than 2 million copies/mL, are less responsive to therapy than patients with a low viral load. (*Id.*) Further, adherence to the therapy is important, as patients with less than 80% adherence to the therapy have a reduced likelihood of SVR. (*Id.*) The NIH has no recommendation regarding the re-treatment of patients who fail to clear the virus after an initial course of therapy, but the guidelines note the existence of ongoing studies in this area. (Defs. 56.1 Stmt. ¶¶ 28, 59; NIH Guidelines at 18.)

DOCS has developed a Hepatitis C Primary Care Practice Guideline ("PCPG"), approved by Dr. Wright in his role as Deputy Commissioner and Chief Medical Officer for DOCS, which governs the treatment of inmates in DOCS custody that have been diagnosed with HCV. (Defs. 56.1 Stmt. ¶ 29.) From 1997 through approximately October 13, 2005, the PCPG required that all inmates enroll in a six month Alcohol and Substance Abuse Therapy ("ASAT") program prior to receiving treatment for HCV. (*Id.* ¶ 33.) From 1997 through approximately October 13, 2005, the PCPG also required that an inmate have enough remaining time

of incarceration to complete the HCV treatment, which was 15 months for those infected with genotype 1 HCV. (*Id.* ¶ 34.) Pursuant to the PCPG, physicians at DOCS facilities can recommend that an inmate be treated for HCV, and Dr. Wright makes the final determination regarding treatment. (*Id.* ¶ 32.)

Plaintiff was incarcerated under the custody of DOCS from 1979 until he was paroled in 2007. (*Id.* ¶ 22; ECF No. 104-1, Declaration of Kevin Harkins ("Harkins Decl."), Ex. C, Inmate Information for Frank DiChiara.) Plaintiff asserts that in 1997, while he was incarcerated at Sing Sing Correctional Facility, he first learned that he was infected with HCV. (ECF No. 112, Affidavit of Frank DiChiara ("Pl. Aff.") ¶ 2.) A member of the medical staff informed plaintiff that his HCV infection was at an early stage at that time, and that treatment was not yet appropriate. (*Id.*) On May 16, 2002, a blood test revealed that plaintiff's viral load had increased significantly, to more than 1 million copies/mL. (Defs. 56.1 Stmt. ¶ 37.) A liver biopsy was ordered to assess the progression of the HCV infection in plaintiff, which was conducted on February 27, 2003. (*Id.* ¶ 38.) The liver biopsy revealed chronic Hepatitis C grade 2, stage 2-3, meaning that there was some inflammation and a moderate to significant amount of scarring on plaintiff's liver. (*Id.*) There is no evidence on the record regarding plaintiff's viral load at the time of

the liver biopsy. Further, plaintiff was infected with genotype 1b of the HCV virus, which is less responsive to treatment than other genetic subtypes of the virus. (*Id.* ¶ 36.)

On April 24, 2003, pursuant the PCPG, Nurse Capuano attempted to enroll plaintiff in ASAT in order to fulfill the requirement for his HCV treatment. (*Id.* ¶ 40.) Plaintiff refused to enroll in ASAT, complaining that he had no history of alcohol or substance abuse. (*Id.* ¶ 42; Pl. Aff. ¶ 5; *see also* Pl. Aff., Exs. 5-6.) On or about April 25, 2003, plaintiff was denied treatment for his HCV infection. (Defs. 56.1 Stmt. ¶ 41; Pl. Aff. ¶ 6.) Pursuant to the PCPG, a member of the DOCS medical staff noted on plaintiff's Ambulatory Health Record, dated April 28, 2003, that the "'correctional counselor thinks [plaintiff] is likely to have less time remaining than treatment would take, do not submit' – [Treatment] for HCV Denied." (Defs. 56.1 Stmt. ¶ 41; Pl. Aff. ¶ 6; *see also* Pl. Aff., Ex. 6.) At that time, plaintiff was scheduled to appear before the parole board for the first time on February 11, 2004. (Defs. 56.1 Stmt. ¶ 43; Harkins Decl., Ex. C, Inmate Information for Frank DiChiara.)

Several times after the denial of treatment, plaintiff requested that treatment for his HCV begin, complaining of "unbearable body itching, fatigue, loss of memory, loss of coordination, insomnia and confusion[,] [and] red bloody pimples

resembling angiomas . . . all over [his] torso and abdomen."
(Pl. Aff., Ex. 4, Ltr. from DiChiara to Wright dated 3/20/2003;
*see also* Pl. Aff., Ex. 11, Ltr. from DiChiara to Wright dated
2/23/2004 (complaining of feeling "pain in the liver section,
weakness, confusion, indigestion, itching, stiffness and
sleepless[ness]").)  In January 2004, plaintiff agreed to enroll
in ASAT.  (Defs. 56.1 Stmt. ¶ 42; Pl. Aff. ¶ 7.)  On or about
February 11, 2004, plaintiff appeared before the parole board
and was denied parole.  (Defs. 56.1 Stmt. ¶ 43.)  After the
denial by the parole board, plaintiff was approved for
combination therapy on March 18, 2004.  (Pl. Aff. ¶ 8; Pl. Aff.,
Ex. 12, Ltr. from Dr. Lang to DiChiara (noting that treatment
had been approved and would begin soon).)  On April 5, 2004,
over one year after the liver biopsy revealed chronic HCV grade
2, stage 2-3, plaintiff began treatment for his HCV infection.
(Defs. 56.1 Stmt. ¶ 44.)  There is no evidence on the record
regarding plaintiff's viral load at the time he commenced
treatment.  Plaintiff was treated with an antiviral therapy
consisting of Pegasys and ribavirin.  (*Id.*)  The medication
chart indicated good adherence to therapy, with over 90% of each
drug administrated for the full duration of the therapy.  (*Id.*)

        After approximately 48 weeks of treatment, on March
16, 2005, a blood test revealed that plaintiff had a viral load
of 590,345 copies/mL.  (*Id.* ¶ 46.)  Plaintiff was seen by Dr.

Rush, an Infectious Disease Specialist, on March 29, 2005, who recommended that the HCV therapy be discontinued. (*Id.* ¶ 47.)[3] On March 30, 2005, the treatment for HCV was terminated because after completing 48 weeks of treatment, plaintiff had not achieved SVR, meaning the virus was still detectable in his blood. (*Id.* ¶ 48.) Defendants continued to monitor plaintiff after termination of his HCV treatment, including performing blood work, a consultation with Dr. Rush, and another liver biopsy. (*Id.* ¶¶ 49-50, 52.)

In January of 2006, plaintiff began requesting re-treatment of his HCV infection, complaining that his physical symptoms had returned and were becoming unbearable. (Pl. Aff. ¶ 10; Pl. Aff., Ex. 15, Ltr. from DiChiara to Dr. Mitchell dated 1/10/2006.) On April 3, 2006, plaintiff was referred to Dr. Liu at the Staten Island University Hospital for a colonoscopy, which was unrelated to his HCV. (Defs. 56.1 Stmt. ¶ 53; Pl. Aff. ¶ 12.) During that visit, plaintiff alleges that he discussed his HCV with Dr. Liu. (Pl. Aff. ¶ 12.) Dr. Liu recommended that plaintiff recommence treatment for HCV if his viral load was high. (*Id.*; Defs. 56.1 Stmt. ¶ 54 (noting that

---

[3]     Defendants offer as evidence of Dr. Rush's recommendation to terminate treatment two documents: the consultation report (*see* ECF No. 104-6, Declaration of Dr. John Supple ("Supple Decl."), Ex. A) and the Ambulatory Health Record containing Dr. Supple's notation of the recommendation (*see* Wright Decl., Ex. D). Plaintiff disputes that Dr. Rush recommended termination of his treatment. (*See* Pl. 56.1 Stmt. ¶ 47.) Plaintiff, however, has provided no evidence to support this position.

Dr. Ezekwe forwarded the consultant report requesting re-treatment).)  Dr. Ezekwe submitted a recommendation to Dr. Wright that plaintiff be re-treated for HCV, forwarding the recommendation made by the consultant, Dr. Liu.  (Defs. 56.1 Stmt. ¶ 54.)  Dr. Wright denied the request for re-treatment, and responded as follows: "He had a year of treatment . . . and did not have a complete end of treatment response.  He has near normal ALT's.[4]  Additionat [sic] treatment with currently available treatments would not be effective and are not indicated."  (*Id.* ¶ 55; Wright Decl., Ex. H.)

On September 15, 2006, Dr. Ezekwe submitted a second recommendation to Dr. Wright that plaintiff be re-treated for HCV, indicating that plaintiff's ALT levels were above baseline. (Defs. 56.1 Stmt. ¶ 56.)  Dr. Wright again denied the request, responding as follows: "Here is a man who has been incarcerated for 27 years and after that has only [grade 1, stage 2] disease, who has relatively low ALT and for whom the currently available [treatment] did not work.  I do not know why a consult was requested in the first place.  In the second place, although some people in the community treat and retreat outside of NIH recommendations and FDA approval for the indication, we have a clear primary care guideline that says we follow national

---

[4]    ALT refers to serum aminosferase, and is considered a measure of liver function.

recommendations.  Please read and follow our primary care guideline; if there is some specific factor in an individual case that may justify going outside of the guideline then that must be clearly stated."  (*Id.* ¶¶ 57-58; Wright Decl., Ex. G.)

Plaintiff was released from DOCS custody on parole on September 20, 2007.  (Pl. Aff. ¶¶ 1, 21; Harkins Decl., Ex. C, Inmate Information for Frank DiChiara.)  Shortly thereafter, plaintiff began re-treatment of his HCV infection.  (Pl. Aff. ¶ 1.)  After completing 72 weeks of treatment, plaintiff has now achieved SVR and cleared the virus from his blood.  (*Id.*)

## DISCUSSION

Plaintiff raises four objections to the findings and recommendations in the Report & Recommendation.  (*See generally* Pl. Obj.)  First, plaintiff argues that the finding in the Report & Recommendation that the delay in treating his HCV infection did not amount to a constitutional violation is incorrect.  (*Id.* at 2-4.)  Second, plaintiff objects to the finding that defendants are entitled to qualified immunity, arguing that the correct standard to apply is whether defendants had "fair notice" that their actions violated a constitutional right, and not whether other "materially similar cases" had established the violation.  (*Id.* at 5-7.)  Third, plaintiff argues that defendants are not entitled to qualified immunity on their failure to re-treat plaintiff for his HCV infection

because Second Circuit precedent clearly established that disregarding a recommendation by a treating physician amounted to an Eighth Amendment violation. (*Id.* at 7-8.) Finally, plaintiff argues that disputed issues of fact should have been decided in favor of plaintiff, not defendants. (*Id.* at 8.)

Defendants respond to these objections, arguing that the findings and recommendations in the Report & Recommendation are correct. (*See generally* Defs. Reply.) First, defendants argue that plaintiff misstates the law governing a delay in medical treatment under the Eighth Amendment, and that, on the facts in this case, plaintiff cannot establish that the delay in treating his HCV infection amounted to a constitutional violation. (*Id.* at 5-10.) Second, defendants argue that Judge Bloom correctly concluded that defendants are entitled to qualified immunity and that the case law requiring merely "fair notice" that conduct violated a constitutional right is inapplicable in this case. (*Id.* at 10-13.) Third, defendants argue that Second Circuit precedent on disregarding a recommendation by a treating physician is inapplicable in this case, and, therefore, defendants are entitled to qualified immunity on this ground. (*Id.* at 13-15.) Fourth, defendants argue that plaintiff misstates the law governing summary judgment review and that the correct standard was applied in the Report & Recommendation. (*Id.* at 15-16.)

Based on this court's *de novo* review of the record and the applicable law, the court addresses each objection to the Report & Recommendation below.

**A.   Objection to the Finding that the One Year Delay in Treatment of Plaintiff's HCV Infection Did Not Amount to a Constitutional Violation**

Plaintiff first objects to the finding in the Report & Recommendation that the one year delay in commencing plaintiff's treatment for HCV did not amount to a constitutional violation. (Pl. Obj. at 1-4.)  The Report & Recommendation concluded that plaintiff failed to proffer evidence that the one year delay resulted in a "very likely" chance of future harm or that his condition actually worsened as a result of the delay.  (R&R at 10-12.)  It reasoned that, because plaintiff eventually cleared the HCV and because plaintiff's expert, Dr. Klion, could not quantify the effect of a one year delay on the success rate for the treatment, plaintiff failed to present evidence that the delay violated his constitutional rights.  (*Id.* at 11-12.) Further, the Report & Recommendation found that plaintiff failed to proffer evidence that his alleged physical symptoms were caused by the delay in treatment, and thus could not recover for alleged mental or emotional injury suffered during the one year of delay.  (*Id.* at 12.)

Plaintiff argues that Supreme Court and Second Circuit precedent clearly establish that a delay in treating a serious

medical condition could establish a violation of the Eighth
Amendment.  (Pl. Obj. at 2-3.)  Further, plaintiff argues that
he "did not clear the virus after the delay in treatment" and
that it was undisputed that "the earlier a patient is treated,
the better the chances of achieving full resolution."  (*Id.* at
4.)  Plaintiff also asks the court to take judicial notice of
information published by WebMD regarding the symptoms of HCV,
which include "'Jaundice (a condition causing yellow eyes and
skin, as well as dark urine), Abdominal pain, Loss of appetite,
Nausea, Fatigue.'"  (*Id.* (quoting WebMD).)  This, according to
plaintiff, is sufficient to raise a question of fact to defeat
summary judgment.  (*Id.*)

Defendants respond that plaintiff has misstated the
law governing a delay in treatment for Eighth Amendment cases.
(Defs. Reply at 5-10.)  The appropriate focus, defendants argue,
is not on the underlying medical condition alone, but on the
challenged delay.  (*Id.*)  Further, defendants argue that,
"[l]ooking at the specific facts in the instant case, it is
clear that plaintiff cannot establish that the one year delay in
commencing his HCV treatment caused him harm" because plaintiff
already "possessed both negative predictors for the combination
therapy being successful" and because Dr. Klion testified that
there was no practical effect of the delay in his treatment and

that plaintiff was eventually cured of HCV after being released from prison.  (*Id.* at 9.)

The court agrees with defendants that plaintiff has misstated the law governing delays in treatment in Eighth Amendment cases.  Generally, to prevail on a deliberate indifference claim, a plaintiff must first demonstrate "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious' - that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'"  *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)).  When, however, a plaintiff complains not about the failure to treat, but about "the inadequacy . . . in the medical treatment given, the seriousness inquiry is narrower."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  If "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone."  *Id.* (internal quotation marks and alterations omitted).  Stated differently, "it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition,

considered in the abstract, that is relevant for Eighth
Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d
Cir. 2003).

The Second Circuit has held that "the severity of the
alleged denial of medical care should be analyzed with regard to
all relevant facts and circumstances." *Id.* at 187. "The
absence of adverse medical effects or demonstrable physical
injury is one such factor that may be used to gauge the severity
of the medical need at issue. Indeed, in most cases, the actual
medical consequences that flow from the alleged denial of care
will be highly relevant to the question of whether the denial of
treatment subjected the prisoner to a significant risk of
serious harm." *Id.* (internal citations omitted). Moreover, "an
Eighth Amendment claim may be based on a defendant's conduct in
exposing an inmate to an unreasonable risk of future harm and
. . . actual physical injury is not necessary in order to
demonstrate an Eighth Amendment violation." *Id.* at 188. "Yet,
although demonstrable adverse medical effects may not be
required under the Eighth Amendment, the absence of present
physical injury will often be probative in assessing the risk of
future harm." *Id.*

Therefore, the case law clearly establishes that the
delay in treatment does not become a constitutional violation
merely because the underlying medical condition, here, Hepatitis

17

C, is indisputably a serious one. "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a 'substantial risk of injury.' Conversely, delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *Graham v. Wright*, No. 01-9613, 2004 U.S. Dist. LEXIS 15738, at *13 (S.D.N.Y. Aug. 9, 2004) (citing *Smith*, 316 F.3d at 186). The court must instead look to "all relevant facts and circumstances" when determining whether a delay in treatment is "objectively serious" for Eighth Amendment purposes. This standard was correctly applied in the Report & Recommendation (*see* R&R at 10-11), and plaintiff is mistaken in his assertion that Supreme Court precedent holds otherwise.

Nonetheless, upon a review of the record, the court agrees with plaintiff that the evidence proffered was sufficient to raise a question of fact regarding the seriousness of the delay in treatment, and thus respectfully modifies that portion of the Report & Recommendation. Defendants argue that plaintiff cannot show that the delay in treatment was sufficiently serious because, in part, plaintiff already "possessed both negative predictors for the combination therapy being successful," that is, plaintiff was infected with HCV genotype 1 and "had a high

18

baseline viral load greater than 800,000 IU/mL." (Defs. Reply at 9.) While it is true that plaintiff was infected with genotype 1, which is less responsive to treatment than genotypes 2 or 3, it is not the case that plaintiff had a high baseline viral load, for purposes of predicting success of treatment, prior to the challenged delay. In support of their argument, defendants cite to the declaration of Dr. Ezekwe. (*Id.*) But the declaration of Dr. Ezekwe does not support that fact. First, Dr. Ezekwe measures the viral load in copies/mL, not in IU/mL. (ECF No. 104-2, Declaration of Dr. Feliz Ezekwe ("Ezekwe Decl.") ¶ 9.) Second, Dr. Ezekwe indicates that, in 2002, prior to the delay in treatment, plaintiff had a viral load greater than 1 million copies/mL. (*Id.*) It is undisputed that, for purposes of predicting response to treatment, a high baseline viral load means more than 2 million copies/mL. (Defs. 56.1 Stmt. ¶ 27.) Therefore, prior to the delay in treatment, plaintiff possessed only one of the negative predictors to treatment, his genotype, and not the other, the high viral load. It was only after the delay that his viral load increased to over 15 million copies/mL as of March of 2004 and that his chances of succeeding in the treatment decreased even further. (*See* Pl. Aff., Ex. 10 (report dated 3/23/2004 showing a viral load for patient Frank DiChiara of 15,296,850 copies/mL).) In fact, plaintiff failed to clear the virus to undetectable

19

amounts during his first 48-week course of treatment with the
antiviral therapy. (Defs. 56.1 Stmt. ¶¶ 46, 48.) Plaintiff was
left with two options after this: leave the infection untreated,
risking cirrhosis of the liver, cancer, or death, or go through
a second round of treatment, enduring the number of side effects
associated with the antiviral therapy. (*See id.* ¶ 25 (noting
that HCV infection can lead to cirrhosis of the liver and be
potentially life-threatening); NIH Guidelines at 16-18 (noting
the side effects (including, *inter alia*, fatigue, itching, rash,
autoimmune disease, bacterial infections, and seizures)
associated with antiviral therapy).)

    Moreover, plaintiff has presented the affidavit and
testimony of his expert, Dr. Klion, which further supports
plaintiff's position that the delay in treatment was serious.
(*See* Klion Dep.; ECF No. 111, Declaration of Dr. Franklin Klion
("Klion Decl.").) Dr. Klion stated that treatment should be
initiated "[o]nce diagnosis of hepatitis C is established and
there is evidence of progressive disease" because treatment at
that stage "has the best chance of arresting the disease."
(Klion Decl. ¶¶ 4-5; *see also* Klion Dep. at 40-41, 78.)
Further, Dr. Klion stated that "treatment with interferon, which
is one of the drugs used in treating hepatitis C, protects the
liver from further damage by slowing scarring and is therefore

beneficial even to patients who end up being non-responders."
(Klion Decl. ¶ 5; *see also* Klion Dep. at 42.)

The court finds that plaintiff has presented
sufficient evidence to raise a question of fact about whether
the delay in treating his HCV was "objectively serious" under
the Eighth Amendment.  It is undisputed that plaintiff failed to
achieve the desired result from his first round of treatment.
(Defs. 56.1 Stmt. ¶¶ 46, 48.)  This occurred once his viral
load, after the delay in commencing treatment, soared to 15
million copies/mL above the threshold of 2 million copies/mL,
making it even less likely that plaintiff would clear the virus.
Further, although Dr. Klion could not quantify how the success
in treatment would be affected by a delay, it was his expert
opinion that early treatment presented a better chance of
arresting progression of the disease and protecting the liver.
While plaintiff was ultimately successful in clearing the virus
after he was released from prison, he has still presented
sufficient evidence to raise a disputed question of material
fact for the jury whether the delay in treatment had an adverse
medical effect of decreasing his chance of clearing the virus
and was sufficiently serious, even if he cannot show a physical
injury.  Consequently, the Report & Recommendation is
respectfully modified in this respect.

Presenting sufficient evidence to raise a question of fact regarding the "objectively serious" nature of the delay in treatment, however, does not end the inquiry.  Plaintiff must also present sufficient evidence to raise a question of fact regarding the second element of his Eighth Amendment claim, that is, that defendants acted with deliberate indifference to his medical needs in delaying the commencement of his HCV treatment. "The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280.  "This requires that the prisoner prove that the charged official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Johnson*, 412 F.3d at 403 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)); *see also Salahuddin*, 467 F.3d at 280 ("In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health."). "Prison officials may, of course, introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the

facts gave rise was insubstantial or nonexistent.'" *Salahuddin*, 467 F.3d at 281 (quoting *Farmer*, 511 U.S. at 844). "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable." *Id.*

While plaintiff alleges that he was denied treatment, in part, because of his failure to enroll in ASAT (*see* Compl. ¶ 52; ECF No. 108, Pl. Mem. in Opp'n to Mot. for Summ. J. ("Pl. Mem.") at 16-17), the evidence suggests otherwise. Nurse Capuano attempted to enroll plaintiff in ASAT, as required by the PCPG, and plaintiff refused. (Defs. 56.1 Stmt. ¶¶ 40, 42; Pl. Aff., Exs. 5-6.) In January of 2004, it was again noted that plaintiff had not satisfied the ASAT requirement under the PCPG. (Pl. Aff., Ex. 9, Ambulatory Health Record dated 1/26/2004.) Nowhere, however, does the record reflect that his HCV treatment was denied or delayed as a result of his lack of ASAT enrollment. Rather, the evidence clearly establishes that plaintiff's HCV treatment was placed on hold because his expected remaining time in incarceration was less than 15 months, the requirement under the PCPG. (Pl. Aff., Ex. 6, Ambulatory Health Record dated 4/28/2003 (noting that treatment for HCV was denied because plaintiff is expected to be paroled);

Pl. Aff., Ex. 7, Ambulatory Health Record dated 6/26/2003
(noting that plaintiff "does not meet the criteria" for
treatment because "he is expected to be paroled in < 15 mos.");
Pl. Aff., Ex. 8, Ambulatory Health Record dated 12/03/2003
(noting that treatment was approved and directing that treatment
not commence until after plaintiff goes to the board).)  In
fact, plaintiff's treatment had already been approved in
December of 2003, although it was put on hold pending the
outcome of the parole hearing, and he enrolled in ASAT in or
about January of 2004.  (Pl. Aff., Ex. 8., Ambulatory Health
Record dated 12/03/2003 (noting that treatment had been
approved).)  It was not until after plaintiff was denied parole
that his treatment was finally cleared and commenced.  (Defs.
56.1 Stmt. ¶¶ 43, 44.)  Thus, the court need only address the
subjective component with respect to the determination to delay
the treatment of plaintiff until after his appearance before the
parole board.

        The Second Circuit, in 2006, addressed the
constitutionality of the PCPG policy to delay treatment of an
HCV patient due to the possibility of parole in *Salahuddin v.
Goord*.  In that case, the Second Circuit found that it could
not, "as a matter of law, find it reasonable for a prison
official to postpone for five months a course of treatment for
an inmate's Hepatitis C because of the possibility of parole

without an individualized assessment of the inmate's actual chances of parole." *Salahuddin*, 467 F.3d at 281. Here, defendants have presented evidence that Dr. Wright, who was responsible for the decision to deny plaintiff HCV treatment, made the determination only after consulting with a counselor and making an individualized assessment of the chances of parole. The April 28, 2003 Ambulatory Health Record for plaintiff states: "E-mail 4/25/03 12:42 pm from Dr. Wright – 'correctional counselor thinks he is likely to have less time remaining than treatment would take, do not submit' – [Treatment] for HCV Denied." (Pl. Aff., Ex. 6, Ambulatory Health Record dated 4/28/2003.) Further, Dr. Wright testified in his deposition that while he has no independent recollection of plaintiff's case, his "usual pattern was to ask the facility to check with the corrections counselor to determine whether it was likely that [the patients] would be paroled or not." (Ofodile Aff., Ex. 2, Deposition of Dr. Lester Wright ("Wright Dep.") at 45-51.) This was done because, according to Dr. Wright, the counselors were in the best position to make a determination of the likelihood that parole would be granted. (*Id.* at 48-49.) Further, Dr. Wright testified that the PCPG policy to deny treatment if the remaining time in incarceration was less than the time required to complete the treatment was enacted based on the medical judgment that interrupted treatment

"is apt to be ineffective and may even be dangerous by selecting out the difficult viruses and leaving . . . the hard ones behind."  (*Id.* at 43.)

Thus, defendants have proffered evidence that the decision to deny plaintiff treatment until after his parole hearing was made only after an individualized assessment of his chances of parole and in accordance with the PCPG policy. Plaintiff has failed to proffer any evidence to raise a question of fact regarding this issue.  No evidence on the record suggest that Dr. Wright had an unconstitutional motive in denying plaintiff treatment or that the determination in his case was not based on an individualized assessment of his chances of parole.  Consequently, plaintiff has failed to raise a question of fact regarding the subjective component of his Eighth Amendment claim for delay in treatment, and defendants are entitled to summary judgment on his claim that the one year delay in treatment violates the Eighth Amendment.

**B.    Objection to the Standard Applied in Granting Qualified Immunity for the One Year Delay in Treatment of Plaintiff's HCV Infection**

Plaintiff next objects to the conclusion in the Report & Recommendation that, even if plaintiff presents sufficient evidence to raise a question of fact that the delay in treatment violated his Eighth Amendment rights, defendants are entitled to qualified immunity.  (Pl. Obj. at 5-7.)  The Report &

Recommendation found the constitutionality of applying the PCPG requirements at issue here was not "clearly established" law at the time defendants engaged in the challenged conduct, and thus defendants are entitled to qualified immunity.  (R&R at 13-17.)  Plaintiff argues that the Report & Recommendation applied the wrong standard to decide the qualified immunity question, requiring precedent with "materially similar facts" rather than "fair warning" to find that the right at issue was clearly established.  (Pl. Obj. at 5-7.)  Defendants respond that the Report & Recommendation correctly concluded that, in the alternative, defendants were entitled to qualified immunity because they did not violate clearly established rights of which a reasonable person would have known.  (Defs. Reply at 10-13.)  Upon a review of the record and relevant case law, the court ultimately agrees with the Report & Recommendation's finding that defendants are entitled to qualified immunity, but respectfully modifies the analysis in reaching this conclusion.

Defendants can show that they are entitled to qualified immunity in two ways.  "First, they are immune from liability if their conduct does not violate 'clearly established' statutory or constitutional rights the existence of which a reasonable person would have known."  *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Connecticut v. Crotty*, 346 F.3d

27

84, 101-02 (2d Cir. 2003) (noting that "qualified immunity is warranted if . . . the official's actions did not violate clearly established law"). "In other words, the unlawfulness of the officials' actions must be apparent to support a viable claim." *Moore*, 371 F.3d at 114. Further, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Id.* Second, defendants are entitled to qualified immunity if they can "establish that it was objectively reasonable for them to believe their actions were lawful at the time." *Id.*; *Crotty*, 346 F.3d at 101-02 (noting that qualified immunity is warranted when, "even if the actions violated clearly established law, the official was objectively reasonable in believing in the lawfulness of his actions"). "That is to say, government officials enjoy immunity from liability 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Moore*, 371 F.3d at 114-15 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). There is a strong presumption favoring granting qualified immunity, and the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Crotty*, 346 F.3d at 102 (internal quotation marks and citation omitted). "Although qualified immunity analysis is both fact-intensive and fact-specific, we have previously held that

summary judgment on qualified immunity grounds is appropriate when a defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law."  *Id.* (internal quotation marks and citation omitted).

Here, the right alleged to have been violated by the application of the PCPG policies by defendants was clearly established.  "[T]he law regarding claims of inadequate medical treatment under the Eighth Amendment put defendants on notice that the Eighth Amendment is violated where a prisoner is deliberately not given medically necessary and available treatment."  *Johnson v. Wright*, 234 F. Supp. 2d 352, 367 (S.D.N.Y. 2002), *rev'd on other grounds*, 412 F.3d 398 (2d Cir. 2005); *see also McKenna v. Wright*, 386 F.3d 432, 436-37 (2d Cir. 2004) (noting that where plaintiff alleges deliberate indifference to medical needs in violation of the Eighth Amendment, "to establish their qualified immunity defense, the defendants must show that it was objectively reasonable for them to believe that they had not acted with the requisite deliberate indifference" (internal quotation marks and citation omitted)); *McKenna v. Wright*, No. 01-6571, 2004 U.S. Dist. LEXIS 725, at *25 (S.D.N.Y. Jan. 21, 2004) (noting that "defendants do not contest that it is clearly established that inadequate medical

29

care may comprise an Eighth Amendment violation when prison officials are deliberately indifferent to an inmate's serious medical needs"); *Brady v. Griffith*, No. 95-2364, 1998 U.S. Dist. LEXIS 18442, at *17 (S.D.N.Y. Nov. 23, 1998) ("It was established in 1976 that prison officials cannot ignore the serious medical conditions of inmates.").

Therefore, to establish that they are entitled to qualified immunity, defendants must show that it was objectively reasonable for them to believe that they were not acting with the requisite deliberate indifferent state of mind. *See McKenna*, 386 F.3d at 436-37. In the instant case, the court finds that defendants have established that their conduct was objectively reasonable. Defendants were relying on and applying the PCPG requirements, which were, in turn, based on the medical judgment of the committee and the then-current national recommendations published by the NIH. (Wright Decl. ¶ 5; Wright Dep. at 35, 43.) Further, Dr. Wright testified in his deposition that every other institution still applies the policy of denying an inmate treatment for an HCV infection if the inmate has less time remaining in incarceration than treatment would require. (Wright Dep. at 43.) Based on these facts, it was objectively reasonable for defendants to believe that application of the PCPG policies to plaintiff did not amount to deliberate indifference to his serious medical needs. *See*

*Verley v. Wright*, No. 02-1182, 2007 U.S. Dist. LEXIS 71848, at
*44 (S.D.N.Y. Sept. 27, 2007) (granting qualified immunity to
prison officials on claim of an Eighth Amendment violation for
application of the PCPG policies, finding that "a reasonable
prison medical official would not necessarily have known that
denying plaintiff treatment in reliance on the [PCPG] would
constitute deliberate indifference to plaintiff's medical
needs"); *cf. Crotty*, 346 F.3d at 108 (finding relevant that
"[o]ther neighboring States had similar statutes on the books at
the time" in determining whether officials enforcing state
statute were entitled to qualified immunity).

Consequently, the court respectfully modifies the
analysis in the Report & Recommendation regarding qualified
immunity, finding that the law prohibiting deliberate
indifference to medical needs was clearly established, but that,
at all relevant times herein, it was objectively reasonable for
defendants to believe that application of the PCPG policies did
not violate the Eighth Amendment.  Defendants are entitled to
qualified immunity on the claim alleging deliberate indifference
in the delay in treatment of plaintiff for his HCV infection,
and summary judgment is granted on this ground.

**C. Objection to the Finding of Qualified Immunity for Disregarding a Recommendation by a Treating Physician for Treatment**

Plaintiff next objects to the findings of the Report & Recommendation, arguing that "Second Circuit precedent made it clear that where prison officials disregard a request for medical treatment from a treating physician, they are not entitled to qualified immunity in a claim alleging [an Eighth] Amendment violation." (Pl. Obj. at 7.) Plaintiff argues that because his treating physician, Dr. Ezekwe, recommended re-treatment of plaintiff for his HCV infection on two occasions, and because a specialist also recommended re-treatment, disregarding those recommendations amounted to an Eighth Amendment violation because this Second Circuit law was clearly established at the time. (*Id.* at 7-8.) According to plaintiff, defendants are not entitled to qualified immunity. (*Id.*)

As an initial matter, the Report & Recommendation does not conclude that defendants are entitled to qualified immunity on the failure to re-treat claim. (*See generally* R&R.) Rather, the Report & Recommendation found that plaintiff merely showed a disagreement in medical judgment and thus failed to establish the subjective component of his claim, *i.e.* that defendants acted with deliberate indifference to his serious medical needs. (*Id.* at 20-21.)

The court agrees with plaintiff that, at the time Dr. Wright denied the re-treatment of plaintiff in 2006, it was clearly established law in the Second Circuit that deliberately disregarding a recommendation for treatment from a treating physician could amount to an Eighth Amendment violation. In *Johnson*, the case cited by plaintiff in support of this objection, the Second Circuit noted that it had "previously held that a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Johnson*, 412 F.3d at 404. That previous holding was made in 1987 in *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987). Therefore, the law was clearly established at the time, and plaintiff is correct that defendants would not be entitled to qualified immunity if the denial of re-treatment had amounted to an Eighth Amendment violation. However, the Report & Recommendation concluded, and the court agrees, that the undisputed facts establish that the denial of re-treatment was based on medical judgment, and not on deliberate indifference to plaintiff's serious medical needs. (*See* R&R at 17-21.) Therefore, the qualified immunity analysis is irrelevant here, and this objection is overruled.

To the extent plaintiff instead argues that the Report & Recommendation incorrectly found that the failure to re-treat plaintiff for his HCV infection did not amount to an Eighth

Amendment violation, the court overrules that objection as well. It is clear that to establish an Eighth Amendment claim for deliberate indifference to medical needs, plaintiff must show more than disagreement regarding his course of treatment. "Allegations of mere negligence in the treatment of a prisoner's physical condition, or claims based on differences of opinion over matters of medical judgment, fail to rise to the level of a § 1983 violation." *Corby v. Conboy*, 457 F.2d 251, 254 (2d Cir. 1972); *see also Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *McKenna v. Wright*, No. 01-6571, 2002 U.S. Dist. LEXIS 3489, at *26 (S.D.N.Y. Mar. 4, 2002) ("[A] disagreement between the medical judgments of the defendant physicians and [plaintiff's expert] does not rise to the level of an Eighth Amendment violation."); *Dichiara v. Pataki*, No. 06-6123, 2007 U.S. Dist. LEXIS 16068, at *9 (E.D.N.Y. Mar. 7, 2007) ("If a prisoner's course of treatment is one about which reasonable doctors could disagree, an Eighth Amendment claim will not ordinarily lie."); *Troy v. Kuhlmann*, No. 96-7190, 1999 U.S. Dist. LEXIS 16027, at *19 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim."); *Muhammad v. Francis*, No. 94-2244, 1996 U.S.

Dist. LEXIS 16785, at *20 ("It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation.").

In the instant case, plaintiff was treated for the full 48 weeks with the antiviral therapy and his treatment was terminated after consultation with Dr. Rush, an Infectious Disease Specialist. (Defs. 56.1 Stmt. ¶¶ 46-48.) Dr. Rush determined that plaintiff failed the initial treatment, and recommended that the antiviral therapy be discontinued. (*Id.* ¶ 47.) Dr. Liu, a consulting gastroenterologist who treated plaintiff for an unrelated condition, recommended that plaintiff be re-treated for HCV if his viral load was high. (*Id.* ¶¶ 53-54; Pl. Aff. ¶ 12.) Dr. Ezekwe recommended that plaintiff be re-treated on two occasions. (Defs. 56.1 Stmt. ¶¶ 54, 56.) Both requests were denied by Dr. Wright, noting that the disease had not progressed significantly in over two decades, that the ALT levels were near normal, and concluding that "[a]dditionat [sic] treatment with currently available treatments would not be effective and are not indicated" and that "although some people in the community treat and retreat outside of NIH recommendations and FDA approval for the indication, [the DOCS medical staff] have a clear primary care guideline [to] follow national recommendations." (*Id.* ¶¶ 55, 57-58; Wright Decl., Exs. G, H.)

It is not disputed in this case that the length of
treatment currently approved for patients infected with HCV
genotype 1 is 48 weeks.  (NIH Guidelines at 10, 12, 18; Klion
Dep. at 28 (noting that "the approved treatment period was
forty-eight weeks").)  Nor is it in dispute that the NIH has no
recommendation for re-treatment of patients who fail to clear
the virus after the initial round of treatment.  (Defs. 56.1
Stmt. ¶¶ 28, 59; NIH Guidelines at 18.)  Instead, plaintiff
argues that these are mere recommendations, and that it is up to
individual physicians to determine the length of treatment for a
patient and whether or not to re-treat after an initial round of
therapy fails.  (Pl. 56.1 Stmt. ¶¶ 28, 59.)  In support of this
argument, plaintiff presents the affidavit and deposition
testimony of Dr. Klion, a specialist in liver disease.  (Klion
Dep. at 51-53; Klion Decl. ¶¶ 9-10.)  The only disagreement here
is not about the facts, but rather about the soundness of the
medical judgment to terminate treatment after 48 weeks and
refuse re-treatment for plaintiff.

The Report & Recommendation found that, based on this
evidence, the failure to re-treat plaintiff for his HCV
infection after the first unsuccessful 48-week course of
treatment did not amount to an Eighth Amendment violation.  (R&R
at 17-21.)  Rather, plaintiff merely established a difference in
medical judgments.  (*Id.*)  The court agrees.  The undisputed

facts do not raise a question about whether defendants were deliberately indifferent to plaintiff's serious medical needs. Defendants terminated treatment and refused to re-treat plaintiff for his HCV infection only after making a medical judgment about whether further treatment was necessary and would be effective. Whether Dr. Klion would have, in his medical judgment, chosen differently is not sufficient to raise an Eighth Amendment deliberate indifference claim. At most, plaintiff raises a malpractice claim. However, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Corby*, 457 F.2d at 254 (noting that "claims based on differences of opinion over matters of medical judgment, fail to rise to the level of a § 1983 violation"); *Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). Thus, to the extent plaintiff objects to the finding in the Report & Recommendation that the failure to treat his HCV beyond

48 weeks was not a violation of the Eighth Amendment, that objection is overruled.

**D.    Objection to the Standard Applied in Resolving Disputed Issues of Fact**

Lastly, plaintiff objects to the standard of review applied in the Report & Recommendation in resolving disputed issues of fact. (Pl. Obj. at 8.) Plaintiff argues that "the Magistrate Judge resolved disputed issues of fact in favor of Defendants and should have accepted Plaintiff's version in summary judgment." (*Id.*) Further, plaintiff argues that "[t]he judge either used Defendant [sic] expert's conclusions to reach her decision or, where she considered Plaintiff's expert [sic] opinion, concluded that it just amounted to a difference in medical opinion." (*Id.*)

Federal Rule of Civil Procedure 56 provides that a court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*

---

[5]    Previously designated Fed. R. Civ. P. 56(c)(2).

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "A fact is material for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation and internal quotation marks omitted).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation and internal quotation marks omitted).  Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006).  The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Salahuddin*, 467 F.3d at 273; *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001).  Nevertheless, "the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to

39

carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see also* Fed. R. Civ. P. 56(e); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture [are] insufficient to preclude the granting of the motion.").

Here, the Report & Recommendation correctly stated the standard for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Supreme Court and Second Circuit case law. (R&R at 7-8.)  Further, having reviewed the record and the findings in the Report & Recommendation, the court concludes that the standard was correctly applied to the facts in this case.  No disputed facts were resolved in the Report & Recommendation.  To the contrary, any disputed facts were properly acknowledged and discussed in the Report & Recommendation.  The Report & Recommendation relied on the facts presented by Dr. Lebovics, defendants' expert, only after concluding that Dr. Klion, plaintiff's expert, was in agreement. (*See generally* R&R.)  The facts were, therefore, undisputed and properly relied upon in the Report & Recommendation.

Moreover, the conclusion that any difference in opinion between Dr. Lebovics and Dr. Klion amounted solely to a difference in medical opinion, rather than a genuine dispute of a material fact precluding summary judgment, was correct.  As was noted above in Section C, "claims based on differences of

opinion over matters of medical judgment, fail to rise to the level of a § 1983 violation." *Corby*, 457 F.2d at 254.  As noted above, "[a] fact is material for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys*, 426 F.3d at 553 (citation and internal quotation marks omitted).  Establishing a disagreement in medical judgment does not, by itself, entitle plaintiff to relief under governing law. Therefore, the disagreement between the experts regarding the proper course of treatment for plaintiff is not a dispute about a material fact.  Consequently, the Report & Recommendation correctly concluded that defendants were entitled to summary judgment because plaintiff failed to show the existence of a genuine issue of material fact regarding the failure to treat him for his HCV infection past 48 weeks.  This objection, as well, is overruled.

/

/

/

/

/

/

/

/

## CONCLUSION

For the reasons set forth above, the court adopts in part and modifies and in part the Report & Recommendation. Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is respectfully directed to enter judgment in favor of defendants and to close this case.


**SO ORDERED.**

DATED:     March 31, 2011
           Brooklyn, New York

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge
                              Eastern District of New York